UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GEORGE SEREBRENNIKOV, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 1:22-cv-12051-IT |
| PROXET GROUP LLC d/b/a RAILS | * | |
| REACTOR and VLADIMIR | * | |
| MEDVEDOVSKY, | * | |
| | * | |
| Defendants. | | |

MEMORANDUM & ORDER

October 20, 2025

TALWANI, D.J.

Plaintiff George Serebrennikov has alleged that he is a former employee of Defendant

Proxet Group LLC ("Proxet"), that his employment was terminated as of July 31, 2022, and that

he is owed $22,500 in unpaid salary, a $100,000 bonus, $16,000 for unused vacation days, and

over $450,000 for unreimbursed employment-related expenses. Am. Compl. ¶¶ 20, 70, 73 [Doc.

No. 28]. He brings claims against Proxet and its sole member and manager, Defendant Vladimir

Medvedovsky, for violation of the Massachusetts Wage Act, M.G.L, c. 149 ("Wage Act"), and

against Proxet for breach of contract and breach of the implied covenant of good faith and fair

dealing. Am. Compl. ¶¶ 60–81. [Doc. No. 28].[1] Defendants' pending Motion for Summary

Judgment [Doc. No. 73] seeks summary judgment on each count of the Amended Complaint

---

[1] Plaintiff's original Complaint [Doc. No. 1] asserted these same three claims. Compl. ¶¶ 54–74
[Doc. No. 1]. The Amended Complaint omits the heading for the breach of the implied covenant
of good faith and fair dealing count but continues to assert that Proxet was bound by and
breached the "implied covenant to deal fairly and in good faith with Serebrennikov." Am.
Compl. ¶¶ 78, 80 [Doc. No. 28].

[Doc. No. 28]. Plaintiff's pending <u>Cross-Motion for [Partial] Summary Judgment</u> [Doc. No. 80] seeks summary judgment that Serebrennikov was Proxet's employee and that the Wage Act is applicable to his employment. <u>See</u> Opp'n and Cross-Mot. 6, 10 [Doc. No. 80]. For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part and Plaintiff's motion is GRANTED.[2]

## I.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Baker v. St. Paul Travelers, Inc.</u>, 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. <u>Id.</u> at 323–324.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of

---

[2] Also pending is Defendants' <u>Motion to Strike</u> [Doc. No. 81], which seeks to exclude material Plaintiff filed in response to Defendants' summary judgment motion. That motion is granted in part and denied in part.

material fact remains. Id. at 324. The non-moving party cannot oppose a properly supported

summary judgment motion by "rest[ing] upon mere allegations or denials of [the] pleadings."

Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by

[his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S.

at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary"

will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly

supported evidence in the light most favorable to the non-movant and draw all reasonable

inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge . . . ruling on a motion for summary

judgment." Anderson, 477 U.S. at 255.

The fact that the parties have filed cross motions does not alter these general standards;

rather the court reviews each party's motion independently, viewing the facts and drawing

inferences as required by the applicable standard, and determines, for each side, the appropriate

ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting

that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather

require the court "to determine whether either of the parties deserves judgment as a matter of law

on facts that are not disputed").

Rule 56(c)(2) provides that "[a] party may object that the material cited to support or

dispute a fact cannot be presented in a form that would be admissible in evidence." Accordingly,

"[e]vidence that is inadmissible at trial . . . may not be considered on summary judgment."

Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998). However, only the substance need be admissible; the party opposing summary judgment need not "produce evidence in a form that would be admissible at trial." See Celotex, 477 U.S. at 324 (emphasis added); see also 10A Wright & Miller's Federal Practice & Procedure § 2722 (4th ed.) (explaining that "the substance or content of the evidence submitted . . . must be admissible, [but] the material may be presented in a form that would not, in itself, be admissible at trial[]").

## II.    Factual Background Based on the Summary Judgment Record[3]

### A.    *The Parties and Related Entities*

Plaintiff George Serebrennikov resides in Florida. In 2005, Serebrennikov created a company named Silversoft, Inc. ("Silversoft"), which is a Florida-based entity that Serebrennikov formed for the purpose of receiving compensation from start-ups for his work with them.

Defendant Proxet was formed in 2009 as a Massachusetts limited liability company. In September 2023, after this lawsuit was filed, Proxet was converted into a Massachusetts business corporation. Proxet (as originally formed and as converted) is a privately held business. Proxet sells custom software development and works in software platforms for clients. Proxet hires both employees and independent contractors to participate in that service.

Proxet's only physical work location in the United States is in Massachusetts. Pl.'s Ex. C, 22 [Doc. No. 78-3] (Kanfer Dep.).[4] Proxet has twelve U.S.-based employees, eight of whom

---

[3] The parties' briefing incorporates statements of fact and responses each side filed regarding the other side's motion for summary judgment. This court therefore looks at filings for both motions, keeping in mind that on Defendants' motion for summary judgment, inferences are to be drawn in Plaintiff's favor, and vice versa. Unless otherwise noted, the facts stated above are undisputed.

[4] Defendants contend as to this fact and as to the asserted work locations of various Proxet employees that the underlying deposition testimony only establishes the relevant locations as of

work in Massachusetts, with the remainder working remotely. Id. at 30–33. Proxet also has a workspace in Ukraine. Id. at 29.

Proxet has subsidiaries in Ukraine, Poland, and Columbia, including Proxet Ukraine LLC ("Proxet Ukraine"), discussed further below.

Medvedovsky is the founder and Chief Executive Officer of Proxet. Medvedovsky was residing in Massachusetts at the time this lawsuit began. Between December 2019 and December 2022, Medovsky lived in California and New Hampshire and worked remotely for Proxet from those states.

B.    *The Written Agreements in the Summary Judgment Record*

1.    The Agreements Between Serebrennikov and Proxet

In July 2016, Serebrennikov and Proxet entered into two agreements: one titled "Consulting Agreement" (the "Consulting Agreement") and the other titled "Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement") (collectively, the "2016 Agreements"). Both agreements have an effective date of July 25, 2016, and both identify Serebrennikov as a "Consultant." Pl.'s Ex. I CM/ECF p. 1 [Doc. No. 78-9] (Consulting Agreement); Pl.'s Ex. J CM/ECF p. 1 [Doc. No. 78-10] (Confidentiality Agreement). Both agreements also include the following choice of law provision:

> **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transaction pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in

---

May 30, 2024, when the deposition was taken, and that these work locations are thus irrelevant to the time period at issue in this case. Where the witness was testifying as Proxet's Rule 30(b)(6) deponent, and where Defendants have not offered contrary evidence regarding Proxet's physical location and the location of various employees during Serebrennikov's tenure with Proxet, a jury could infer that the deponent was describing Proxet's U.S. work locations at all times relevant to the dispute.

accordance with the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflict of laws.

Pl.'s Ex. I ¶ 11(a) [Doc. No. 78-9]; Pl.'s Ex. J ¶ 12(a) [Doc. No. 78-10].

The Consulting Agreement states that during its term, Serebrennikov "will provide "consulting services" identified as "senior project management services as reasonably requested from [Proxet's] CEO from time to time." Pl.'s Ex. I ¶ 1 [Doc. No. 78-9]. This agreement states further that Serebrennikov's "relationship with [Proxet] will be that of an independent contractor and not that of an employee" and that he "shall be solely responsible for determining the method, details and means of providing" the services described in the agreement. Id. ¶¶ 1, 5–6. At the same time, the Consulting Agreement provides that "[a]ll services to be performed by [Serebrennikov], including but not limited to the Services [identified in the Consulting Agreement] will be as agreed between [Serebrennikov] and the [CEO of Proxet]. [Serebrennikov] will be required to report to the [CEO] concerning the Services performed under this Agreement." Id. ¶ 7. Exhibit B to the Consulting Agreement provides that "[f]or Services rendered by [Serebrennikov] under this Agreement, [Proxet] shall pay [him] at the rate of $6,875.00 semi-monthly, payable after [Serebrennikov] submits invoices." Id. CM/ECF p. 7.

The Consulting Agreement states that it automatically renews for additional one-year periods until the earlier of (1) "the completion of the Services to [Proxet's] reasonable satisfaction," or (2) termination of the agreement by either Proxet or Serebrennikov. Id. at ¶ 4. The Consulting Agreement also states that "[n]o modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement." Id. at ¶ 11(c). There is no evidence in the record that the Consulting Agreement was terminated or modified in a writing signed by the parties at any time prior to the events described below.

The Consulting Agreement includes the Confidentiality Agreement as Exhibit C. Id. CM/ECF p. 8. The Confidentiality Agreement, in turn, provides that it "will apply to [Serebrennikov's] consulting relation relationship with [Proxet][,]" and that it would apply to any subsequent employment or consulting relationship that Serebrennikov and Proxet entered in the event that the initial consulting relationship terminated, "unless [Serebrennikov and Proxet] otherwise agree in writing." Pl.'s Ex. J ¶ 1 [Doc. No. 78-10]. The Confidentiality Agreement provides that Serebrennikov understands that Proxet intends to provide him with confidential information and trade secrets during any employment or consulting relationship between the parties, id. ¶ 3, and it includes provisions protecting that information. See generally Pl.'s Ex. J [Doc. No. 78-10].

                    2.    The Contract Between Serebrennikov and Proxet Ukraine

Serebrennikov also entered into a contract with Proxet Ukraine, titled "Employment Contract," with an effective date of January 26, 2018. See Defs.' Tab F [Doc. No. 76-6]. The Employment Contract states that it creates "employer-employee relations" between Serebrennikov and Proxet Ukraine, that "[t]he Labor Code of Ukraine, other regulatory acts governing labor relations, apply to the mutual relations of the parties under this contract," that disputes between Serebrennikov and Proxet Ukraine "shall be resolved in accordance with procedure established by the current law of Ukraine," and that Serebrennikov and Proxet Ukraine "shall be governed by the current law of Ukraine" for matters not stipulated in the employment contract. Defs.' Tab F, arts. 1.2, 8.2, 10.1 [Doc. No. 76-6]. The Employment Contract provides further that Serebrennikov would be paid "a monthly salary of 8,000 . . . hryvnias from [Proxet Ukraine's] funds to perform the duties stipulated in this contract." Id. art. 3.1. The Employment Contract also provided for 24 calendar days of vacation per year, and "representative expenses,

including in foreign currency (in case of a business trip abroad), based on annual budget." Id. art. 3.1, 3.2, 3.3. Defendant Proxet was not a party to this agreement. See id. art. 11.

C.    *Serebrennikov's Work*

Serebrennikov began performing services for Proxet after the parties entered into the two agreements in July 2016. Shortly after signing those agreements, Serebrennikov rented an apartment in Kiev. Serebrennikov worked in Ukraine for almost 8 months during the first year of the contractual relationship with Proxet.

On December 15, 2017, Serebrennikov formed Proxet Ukraine.[5] Serebrennikov was appointed Director of Proxet Ukraine and managed its operations. Serebrennikov continued to spend several months at a time working in Ukraine, and shorter periods back in the United States, each year until the war in Ukraine began in February 2022. From February 2022 through July 31, 2022, Serebrennikov split his time between the United States, Turkey, and Poland.

Serebrennikov worked as Proxet's Chief Operating Officer[6] and oversaw Proxet's foreign operations. Pl.'s Ex. D ¶ 2 [Doc. No. 78-4] (Serebrennikov Aff.); Pl.'s Ex. E [Doc. No. 78-5] (Medvedovsky's Announcement); Pl.'s Resp. to Defs.' SOMF ¶ 9 [Doc. No. 77]; see also Pl.'s Ex. W 3 [Doc. No. 78-23] (identifying Serebrennikov as "Chief Operating Officer").[7] He provided operational services for Proxet and reported to Medvedovsky. He dealt with some

---

[5] Proxet owns 75% of Proxet Ukraine. Serebrennikov owns the remaining 25%.

[6] Defendants acknowledge only that Serebrennikov was referred to as COO but offer no evidence to counter Serebrennikov's affidavit stating that he held that role. See Pl.'s Ex. D [Doc. No. 78-4] (Serebrennikov Aff.).

[7] Defendants move to strike this page of Exhibit W, which they contend "consists of Plaintiff's incomplete, one-page PeopleForce printout, and is "an unauthenticated printout . . . with pages missing." Defs.' Mot. to Strike 20 [Doc. No. 81]. Where Defendants do not dispute that the page is a printout from PeopleForce, see id., and where the document can be authenticated by witness testimony, the motion to strike is DENIED as to this exhibit.

Proxet clients, participated in the sales process, helped prepare marketing materials, and helped develop Employa, a prototype product for Proxet. Serebrennikov also coordinated with Ruth Kanfer, Proxet's legal counsel and head of U.S. operations, on some Proxet matters.

     D.    *Serebrennikov's Compensation*

Proxet paid Silversoft for the work Plaintiff did as part of his 2016 initial consulting engagement. From at least December 2019 through July 2022, Serebrennikov received from Proxet a monthly payment of $22,500, which was paid to him personally but deposited into his Silversoft account.

Proxet made $50,000 payments to Serebrennikov at his Silversoft account on September 27, 2019, and September 1, 2020, and made a $100,000 payment into that account on August 3, 2021. There was no written agreement regarding these payments. However, Serebrennikov states that when he began working for Proxet in 2016, he had an agreement with Defendants for an annual nondiscretionary bonus of $50,000, and that in 2021, Defendants verbally agreed to increase his annual bonus to $100,000. Serebrennikov Affidavit ¶¶ 3–4 [Doc. No. 78-4]; see also Serebrennikov Deposition 181:11–183:10 (recounting 2021 conversation with Medvedosky).[8] Defendants contend that these payments were to thank Serebrennikov for his work. See SOMF ¶ 17 [Doc. No. 77].

---

[8] In addition to his Declaration, Plaintiff has proffered Exhibit M which his counsel contends "is a copy of text messages between Plaintiff and Medvedovsky about increasing Plaintiff's bonus." Pl.'s Reply 9 [Doc. No. 83]. Defendants move to strike the text messages, which are in Russian, and for lack of foundation. The court GRANTS that request and strikes these messages from the summary judgment record where Plaintiff has provided no translation of the documents.

Serebrennikov received from Proxet Ukraine 8,000 hryvnias per month, which he calculates as approximately 1% of the total monthly income he received from Proxet and Proxet Ukraine. Pl.'s Counter-Statement ¶ 44 [Doc. No. 77].

Proxet also timely reimbursed Serebrennikov for each expense he submitted to Proxet for reimbursement prior to his last day with Proxet. Such expenses included Serebrennikov's airfare and other costs related to his travel to and from Kiev, equipment and office supplies Serebrennikov purchased for the Proxet's offices in Kiev, and Serebrennikov's business meals. It was Serebrennikov's responsibility to submit reasonable evidence that the amount involved was both reasonable and necessary to the services he was providing to Proxet. Serebrennikov did not submit all the expenses he incurred to Proxet for reimbursement prior to his last day with Proxet.

Serebrennikov states that under Proxet's policy, both consultants and employees received 20 vacation days in each of their first three years, received 25 vacation days in each of the next two years, and received 30 vacation days each year beginning in their sixth year with Proxet. See Pl.'s Ex. A 119–120 [Doc. No. 78-1]. Consistent with Serebrennikov's statement of this policy, a two-page document that Proxet produced in discovery titled "History" and "Vacation," lists accruals of 20 days on August 29, 2016, August 29, 2017, and August 29, 2018; 25 days on August 29, 2019, and August 29, 2020; and 30 days on August 29, 2021. Pl.'s Ex. W CM/ECF pp. 1–2 [Doc. No. 78-23].[9]

---

[9] Exhibit W appears to be two separate documents: the two page bates-stamped document described here, and a third page described by Defendants as Plaintiff's "one-page People Force printout." See Defs.' Mot. to Strike 20 [Doc. No. 81]. The court understands Defendants' objection to Exhibit W to concern the PeopleForce printout discussed above.

E.    *Serebrennikov's Final Months of Work and Departure*

On February 16, 2022, Serebrennikov sent a message to Kanfer and asked her to talk to Medvedovsky because Serebrennikov "want[ed] out." Defs.' Tab B CM/ECF p. 155 [Doc. No. 76-2]. Serebrennikov stated further that he "apologized for trouble it may cause, but it is impossible to continue." Id. He asked Kanfer to discuss with Medvedovsky how to move forward and how long they needed Serebrennikov to continue working. Id. On February 20, 2022, Serebrennikov wrote to Kanfer stating, "Hi Ruth. It is a week since our conversation. I hope you started actively looking for my replacement." Id. at CM/ECF p. 154. Because the war in Ukraine started a few days after this conversation, the parties temporarily agreed that Serebrennikov would stay at Proxet for at least another month or two, until the middle or end of March, and then continue the conversation.

In March, Serebrennikov told Kanfer he could continue working through the end of August. Defs.'s Tab A CM/ECF p. 147 [Doc. No. 76-1].[10] Kanfer and Medvedovsky accepted this end date.

On June 2, 2022, Serebrennikov emailed Medvedovsky stating that he was returning to the United States for three weeks on June 9, 2022, and "would like to announce [his] departure in September rather sooner than later." Pl.'s Ex. O CM/ECF p. 1 [Doc. No. 78-15]. The same day, Serebrennikov sent a separate email to Medvedovsky and Kanfer suggesting that "rather than saying [he] is resigning in September, to say that [he] is resigning immediately and will remain

---

[10] Medvedovsky states that "Serebrennikov informed Kanfer that he would depart in August 2022." Defs.' Tab E ¶ 9 [Doc. No. 76-5] (Medvodovsky Aff.) (emphasis added). Medvedovsky's statement as to what Serebrennikov stated to Kanfer is inadmissible hearsay.

with the company until September in [an] advisory role to ensure a smooth transition to new management." Pl.'s Ex. P [Doc. No. 78-16].

On June 9, 2022, Medvedovsky sent an email to the "Proxet team" stating that Serebrennikov would be "retiring from his role as COO of Proxet at the end of the summer." Defs.' Tab. B CM/ECF p. 176 [Doc. No. 76-2]. Also in June, Serebrennikov's "functions" were "allocated" to Yuriy Grushevoy. Defs.' Tab. C 68 [Doc. No. 76-3].

Serebrennikov stayed in Poconos Pines, Pennsylvania, from June 9, 2022, through June 26, 2022. The parties dispute whether Serebrennikov was on vacation or working during this period. Serebrennikov states that he was actively working for Proxet during this time and was in touch with Medvedovsky and Grushevoy. Pl.'s Ex. A 154–55 [Doc. No. 78-1]. He acknowledges, however, that Grushevoy "took over all [Serebrennikov's] responsibilities, and [Serebrennikov's] role was mostly advisor rather than executive officer of the company." Id. at 155. On June 15, Serebrennikov emailed one of Proxet's clients and informed her that he was resigning from his position as Proxet's COO, effective immediately, that he would stay with the company until the end of August as an advisor to ensure a smooth transition, and that Grushevoy would be taking over his responsibilities. Pl.'s Ex. R [Doc. No. 78-18].

On July 1, 2022, Serebrennikov visited Proxet's office in Poland. According to Kanfer, "during the month of July Mr. Serebrennikov had substantially reduced his services." Defs.' Tab C 57 [Doc. No. 76-3]. Serebrennikov admits that during July he stopped attending daily meetings with Medvedovsky and Grushevoy. Pl.'s Ex. A 156 [Doc. No. 78-1].

On July 28, 2022, Serebrennikov emailed Medvedovsky proposing three scenarios for the terms of his departure. All three scenarios included Serebrennikov receiving $22,500, which he described as "[t]he regular amount for July," and a "$100,000 bonus for the 12 months

September 2021 to September 2022. Pl.'s Ex. S [Doc. No. 78-19]. Under the first scenario, Proxet would "dismiss[]" him on July 31, "[o]ne month earlier than agreed[,]" and would provide a two-week severance payment where the parties had agreed Serebrennikov would work through the end of August, plus compensation for 15 days of unused vacation. Id. Under the second and third scenarios, Serebrennikov would "leav[e] the company by the end of August, as previously agreed," and receive the $22,500, which Serebrennikov characterized as "the regular amount for August." Id. Under the second scenario, Serebrennikov would work through August and receive 15 days of unused vacation, and under the third, he would take his remaining 15 days of unused vacation during August. Id.

Kanfer responded by email on July 30, 2022, rejecting these scenarios. Pl.'s Ex. T CM/ECF p. 1 [Doc. No. 78-20]. Kanfer stated that Proxet had agreed that Serebrennikov "would remain working in [his] regular capacity until August 31[,]" but that Serebrennikov had asked to announce his departure and immediate transitioning of his work scope on June 2. Id. She stated further that in June, Medvedovsky, Kanfer, and two others had "taken over various areas of [Serebrennikov's] prior responsibilities" and that Serebrennikov's "work responsibilities [had] been in a wholly reduced capacity" during July. Id. Kanfer included a draft Termination Agreement with her email. Id. She and Serebrennikov negotiated unsuccessfully over the terms of his departure.[11]

---

[11] Defendants object to Exhibit X, Proxet's draft termination agreement, as inadmissible under Federal Rule of Evidence 408. Defs.' Mot. to Strike 20 [Doc. No. 81]. Defendants' Combined Partial Motion to Dismiss Plaintiff's Amended Complaint, and to Strike [Doc. No. 31] raised the same issue at an earlier stage of proceedings, and the court explained at that time that Rule 408 "is designed to encourage settlement negotiations after a controversy has actually arisen," and "its applicability depends on the timing of an offer and the existence of a disputed claim[.]" Mem. & Order 5 [Doc. No. 51] (citing Hiram Ricker & Sons v. Students Int'l Meditation Soc., 501 F.2d 550, 553 (1st Cir. 1974); Moreta v. First Transit of PR, Inc., 39 F. Supp. 3d 169 (D.P.R.

Serebrennikov's final day with Proxet was Sunday, July 31, 2022. On that date, he printed the page from Proxet's PeopleForce website discussed earlier. Pl.'s Ex. A 131 [Doc. No. 78-1]. The document states that he had 15 days of available vacation. See Pl.'s Ex. W [Doc. No. 78-23].[12] Proxet paid Serebrennikov, through Silversoft, his monthly fee of $22,500 through July 2022. On August 1, 2022, Serebrennikov sent a company-wide "goodbye" email. Proxet held a farewell dinner for Serebrennikov in Bratslav, Poland, on August 3, 2022.

Serebrennikov claims that between February 17, 2016, and August 9, 2022, he had incurred over $273,000 in unreimbursed employment expenses, including renting an apartment in Kiev, business meals and transportation in Kiev, internet and technology-related costs in Kiev, and his travel expenses between his last day with Proxet and August 9, 2022. Pl.'s Counter-Statement ¶ 75 [Doc. No. 77]; Chart of Unreimbursed Expenses, Ex. Y [Doc. No. 78-25];[13] Pl.'s

---

2014) (internal quotations omitted)). The court denied the earlier motion where Plaintiff had alleged that the Termination Agreement was "was offered contemporaneous to Plaintiff's termination, on July 28, 2022." Id. But the record on summary judgment reflects that a controversy had arisen when Kanfer rejected Serebrennikov's proposed scenarios on July 30, 2022. See Pl.'s Ex. T [Doc. No. 78-20].

Where the offer reflected in the Termination Agreement countered Serebrennikov's earlier proposals, "an actual dispute or difference of opinion" existed as to the terms of Serebrennikov's departure when he received that offer. See Weems v. Tyson Foods, Inc., 665 F.3d 958, 965 (8th Cir. 2011). Therefore, a dispute existed when Kanfer sent the Termination Agreement, and the Termination Agreement is inadmissible "to prove or disprove the validity or amount" of Serebrennikov's claims. Fed. R. Evid. 408(a). Because the Termination Agreement has not been offered for other purposes, see Fed. R. Evid. 408(b), the motion to strike the draft agreement from the summary judgment record is GRANTED.

[12] To the extent that Defendants contend that Exhibit W is not an accurate record of vacation time that Serebrennikov had remaining as of July 31, 2021, their contention raises questions as to Exhibit W's weight rather than its admissibility. See United States v. Deverso, 518 F.3d 1250, 1256 (11th Cir. 2008) (explaining challenge to reliability of information that document contained "goes to the weight of the evidence, not its admissibility on grounds of authenticity"); United States v. Tropeano, 252 F.3d 653, 661 (2d Cir. 2001) (explaining challenges to reliability of evidence "go to the weight to be given to the [evidence] by the jury, not to [its] admissibility").

[13] Defendants move to strike Exhibit Y because it "was produced for the first time in support of Plaintiff's Response." Mot. to Strike 19–20 [Doc. No. 81]. However, "[t]he court may admit as

Ex. Z [Doc. No. 78-26] (Index of Receipts). Serebrennikov provided the itemized list of "unreimbursed employment expenses" to Defendants on August 9, 2023.

## III.    Discussion

### A. *Choice of Law*

The court begins by considering whether Massachusetts law applies to the parties' dispute. Because this is a diversity action, the court applies the choice-of-law principles of the forum state to determine the applicable substantive law. Viscito v. National Planning Corp., 34 F.4th 78, 83 (1st Cir. 2022).

When "the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy." Dahua Technology USA Inc. v. Zhang, 988 F.3d 531, 537 (1st Cir. 2021) (citations omitted). In the absence of an agreement as to the choice of law, "Massachusetts follows 'a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." Viscito, 34 F.4th at 83 (citations omitted). "Under the functional approach, the forum applies the substantive law of the state which has the more significant relationship to the transaction in litigation." Id. (citations omitted).

The parties rely on Massachusetts law regarding Serebrennikov's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. However, the parties

_____

evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings" so long as the proponent makes the underlying evidence available to the other parties. See Fed. R. Evid. 1006(a)–(b). Exhibit Y is an excel spreadsheet listing purported business expenses and includes columns referencing files containing particular receipts. See Pl.'s Ex. Y [Doc. No. 78-25]. And Plaintiff has separately provided receipts purportedly corresponding to the expenses listed in Exhibit Y. See Pl.'s Ex. Z [Doc. No. 78-26]; Pl.'s App'x [Doc. Nos. 78-1–78-76]. Where Exhibit Y summarizes receipts Serebrennikov has provided in support of his Response and Cross-Motion for Summary Judgment [Doc. No. 80], the motion to strike Exhibit Y is DENIED.

each seek summary judgment as to whether Massachusetts law applies such that the Wage Act governs the parties' working relationship.

Where a Massachusetts statute "is silent as to its extraterritorial effect," Massachusetts courts "rely on [the state's] 'functional' choice-of-law principles in assessing the applicability of the statute to the plaintiffs' claims." Taylor v. E. Connection Operating, Inc., 465 Mass. 191, 198, 988 N.E.2d 408 (2013). The Massachusetts Wage Act does not expressly foreclose extraterritorial application. Dow v. Casale, 83 Mass. App. Ct. 751, 756, 989 N.E.2d 909 (2013) (noting that the Wage Act "does not, in terms, restrict its remedies to employees who live or work in Massachusetts"). As a result, the statute applies extraterritorially—and affords protections to out-of-state employees—so long as Massachusetts has the most significant relationship to the plaintiff's employment. See Viscito, 34 F.4th at 83 (1st Cir. 2022); Dow, 83 Mass. App. Ct. at 754–58 (holding that an employee could bring a claim under the Wage Act so long as Massachusetts had "the most significant relationship" to the parties and to their employment situation).

The First Circuit has explained that whether Massachusetts has the most significant relationship to a worker's claim for unpaid compensation depends on a variety of considerations, including "the state where the employer's headquarters is located, the place(s) the worker performed the work, the frequency of interactions between the worker and the employer in Massachusetts, whether another state has a significant connection to the worker and work performance, and whether the contract between the worker and employer has a choice-of-law provision." Viscito, 34 F.4th at 85 (citing Dow, 83 Mass. App. Ct. at 757–58).

Defendants contend that "the operative contract" is Serebrennikov's Employment Contract with Proxet Ukraine, and that contract provides for choice of law in Ukraine. Mem. ISO

16

Defs.'s Mot. for Summary Judgment 5 [Doc. No. 74]. Defendants argue further that Proxet's

physical offices, operations, and engineering personnel were all based in Ukraine; Serebrennikov

lived in Ukraine and performed his work for Proxet there; and Plaintiff and Defendants had

"virtually no interactions in Massachusetts." Mem. ISO Defs.' Mot. for Summary Judgment 6

[Doc. No. 74].

Serebrennikov responds that Defendants mistakenly focus on his agreement with Proxet's

Ukranian subsidiary, which only references disputes between Serebrennikov and Proxet Ukraine,

and that Proxet was his employer where Serebrennikov was Proxet's COO, Proxet paid him

98%–99% of his total pay, and Serebrennikov worked pursuant to an agreement with Proxet.

Opp'n to Defs.' Mot. Cross-Mot. 14–15 [Doc. No. 80]. Serebrennikov points out that both

agreements he executed with Proxet include a Massachusetts choice of law clause.

Serebrennikov also argues that Massachusetts law applies because Proxet's headquarters and

physical location is in Massachusetts, Serebrennikov "was paid out of Massachusetts," and

several Proxet employees, including its CEO, head of U.S. Operations, Chief Design Officer, and

Vice President of Operations, are located in Massachusetts. Id. 10.

The court finds Defendants' reliance on the choice of law provision in Serebrennikov's

Employment Contract with Proxet Ukraine misplaced where Serebrennikov does not bring any

claims under that Employment Contract, and where his dispute is with Proxet and its CEO,

Medvodovsky. Neither Proxet nor Medvodovsky is a party to the Employment Contract. Defs.'

Tab F CM/ECF p. 6 [Doc. No. 76-6].

The court finds further that Massachusetts is the state with the most significant

connection to the parties' working relationship. Proxet was organized as an LLC in

Massachusetts in 2009. Pl.'s Ex. F. [Doc. No. 78-6]. Proxet also issued Serebrennikov IRS forms

in 2018, 2019, 2020, and 2021 that list Proxet as located in Massachusetts and reflect that Proxet

paid Serebrennikov from that location. Pl.'s. Ex. G [Doc. No. 78-7] (2018, 2019, 2021); Pl.'s Ex.

H (2020) [Doc. No. 78-8]. Proxet's headquarters are in Massachusetts, its management team was

either based there or worked remotely, and it has no other location in the United States. Proxet

and its Ukranian subsidiary together have only held between one and three "office spaces" in

Kiev. Pl.'s Ex. C 26, 29 [Doc. No. 78-3]. That Proxet is based in Massachusetts and lists a

Massachusetts address on tax records is significant as the Wage Act "is directed at the regulation

of employers and does not, in terms, restrict its remedies to employees who live or work in

Massachusetts." Dow, 83 Mass. App. Ct. at 756.

Plaintiff worked for Proxet primarily from outside the United States, including at the

Proxet Ukraine location, and during his last five months with Proxet, in Turkey and Poland. But

Defendants' focus on Serebrenikov's relationship with Proxet Ukraine ignores the direct

relationship between Proxet and Serebrennikov. Throughout the relationship, he reported to

Proxet's management team located in Massachusetts (or wherever they were working from

remotely). And Serebrennikov performed significant services for Proxet: It is undisputed that

Serebrennikov "provided operational services for Proxet"; dealt with some Proxet clients;

coordinated with Kanfer, Proxet's legal counsel and head of U.S. operations, on Proxet matters

and on Serebrennikov's departure from Proxet; helped develop a prototype product called

Employa for Proxet; prepared some marketing materials for Proxet; and provided summaries and

descriptions of projects to Medvedovsky, Proxet's CEO. See Defs.' Resp. to Pl.'s SOMF ¶¶ 23,

26, 28–30, 34 [Doc. No. 82].

The Massachusetts choice of law clauses in Serebrennikov's Consulting Agreement and

the related Confidentiality Agreement with Proxet also support application of Massachusetts law

to the dispute. Those clauses are not mandatory here, where Plaintiffs' claims are not based directly on those contracts. But they demonstrate that the parties chose Massachusetts as an appropriate forum for disputes related to their working relationship.

Viscito v. National Planning Corporation is not to the contrary. There, the court's analysis focused on the state in which the employer benefitted from the plaintiff's work: California had the most significant relationship to the plaintiff's employment where the plaintiff's work "benefited the California-based [employer] in California because [the employer] did not have any facilities or employees in Massachusetts." Viscito 34 F.4th at 86. Here Serebrennikov's work benefitted Proxet in Massachusetts even though he was primarily based in Ukraine. See Dow, 83 Mass. App. Ct. at 758 (explaining plaintiff's "work sensibly may be viewed as having 'occurred' in Massachusetts where it benefited" an employer headquartered in Massachusetts "no matter where he physically was located from day to day").

Finally, Defendants have not identified another state with a more significant relationship to Serebrennikov's work for Proxet. The "most significant relationship" standard examines whether Massachusetts has the most significant relationship to Plaintiff's work "as compared to any other State." Dow, 83 Mass. App. Ct. at 757; see also Viscito, 34 F.4th at 83 ("Massachusetts follows a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole.") (emphasis added) (citations omitted). The only other state with a plausible interest in Serebrennikov's claims is Florida, where he resided and received payment. But Defendants do not argue that Florida law should apply. Defs.' Mem. ISO Mot. for Summary Judgment 4–9 [Doc. No. 74]. And although Serebrennikov worked outside of Massachusetts and Proxet maintained operations outside of the state, Massachusetts has the most significant relationship where his work benefitted and was

directed by a Massachusetts entity. Accordingly, Massachusetts law, including the Wage Act, applies in this case.

B.    *Defendants' Motion for Summary Judgment*

1.  Violation of The Massachusetts Wage Act

Defendants contend that if the Wage Act applies, Serebrennikov cannot demonstrate that Defendants failed to pay him any wages due. Mem. ISO Def.'s Mot. for Summary Judgment 9 [Doc. No. 74]. Specifically, Defendants argue that Serebrennikov cannot recover under the Wage Act the unreimbursed work expenses he claims, payment for unused vacation time, or the $100,000 bonus that he asserts was due at the end of August 2022. Id. 9, 12.

"The purpose of the Wage Act is 'to prevent the unreasonable detention of wages.'" Dow, 83 Mass. App. Ct. at 754 (quoting Melia v. Zenhire, Inc., 462 Mass. 164, 170, 967 N.E.2d 580 (2012)).

> Section 148 of the Wage Act provides, in pertinent part: "Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him . . . and any employee discharged from such employment shall be paid in full on the day of his discharge . . . ." Such "wages" include, among other things, holiday or vacation pay due under an oral or written agreement, and commissions that are "definitely determined" and "due and payable" to the employee.

Id. (quoting M.G.L. c. 149, § 148).

For compensation to be considered "wages" owed under the Wage Act, such compensation must be earned, meaning that an individual must "complete[] the labor, service, or performance required of him" in exchange for the claimed wages. Fernandes v. Attleboro Hous. Auth., 470 Mass. 117, 124 n.6, 20 N.E.3d 229 (2014) (internal citations omitted); see also M.G.L. c. 149, § 148.

a.    Unreimbursed Work Expenses

Based on his summary judgment filings, Serebrennikov is claiming $273,707.66 in unreimbursed expenses. <u>See</u> Pl.'s Ex. Y [Doc. No. 78-25]. Defendants contend that this claim fails where Serebrennikov was reimbursed for every expense he submitted to Proxet. Defs.' Mem. ISO Mot. for Summary Judgment 9 [Doc. No. 74].

"[A]n employer may not reduce wages" by requiring "payments by an employee to or on behalf of the employer." <u>Fraelick v. PerkettPR, Inc.</u>, 83 Mass. App. Ct. 698, 708, 989 N.E.2d 517 (2013). Under the Wage Act, requiring employees to front expenses for the employer's benefit can constitute wage reductions because the Wage Act bars wage reduction "by any other means." <u>See</u> <u>Furtado v. Republic Parking Sys., LLC</u>, 2020 WL 996849, at *4–5 (D. Mass. Mar. 2, 2020).

As to almost all of the expenses claimed, Serebrennikov has failed to show that Proxet required him to front expenses on Proxet's behalf without reimbursement. To the contrary, it is undisputed that, prior to Serebrennikov's last day with Proxet, Proxet timely reimbursed him for every expense that he submitted for reimbursement. Moreover, as to the expenses he now seeks to recover under the Wage Act for the period through July 31, 2022, Serebrennikov has made no showing that these were expenses Proxet required him to front for Proxet's benefit.

However, any expenses Serebrennikov fronted to pay the costs of his return to the United States fall into a different category. Where Serebrennikov's residence was in the United States, a jury could find that Proxet's failure to reimburse Serebrennikov for expenses he incurred in connection with his return from Poland to Florida amounted to an improper wage reduction under the Wage Act. Defendants may be able to defend against this claim based on a failure by Serebrennikov to timely submit the expenses for reimbursement where there is no evidence in the summary judgment record that he sought reimbursement for these expenses prior to his response to Defendants' interrogatory on August 9, 2023. But where no evidence in the record

21

establishes a timeliness requirement, the court is unable to determine when Serebrennikov was required to submit these travel expenses for reimbursement on summary judgment.

>    b.    Unused Vacation Time

Serebrennikov seeks $16,000 under the Wage Act for unused vacation days. See Am. Compl. ¶ 70 [Doc. No. 28]. Under the Wage Act, "wages" include "holiday or vacation payments due an employee under an oral or written agreement." M.G.L. c. 149, § 148. Accordingly, "a terminated employee is entitled to all accrued vacation benefits on the day of discharge," Reuter v. City of Methuen, 489 Mass. 465, 468, 184 N.E.3d 772 (2022), and an employee who leaves his employment is entitled to all accrued vacation benefits "on the following regular pay day." M.G.L. c. 149, § 148.

Defendants argue that Serebrennikov cannot recover the $16,000 he seeks because he authorized a $20,357 "vacation" payment to himself in May 2022 and then took a three-week vacation in Poconos Pines. Defs.' Mem. ISO Mot. for Summary Judgment 12 [Doc. No. 74]; see also SOMF ¶ 24 [Doc. No. 75] ("On May 31, 2022 . . . Plaintiff authorized a $20,357.10 payment to himself for 'unused vacation time.'").

In his deposition, Serebrennikov stated that he was entitled to at least 30 vacation days in 2022 under Proxet's company policy, and according to the two-page document produced by Proxet in discovery, Serebrennikov did accrue that amount in August 2021. Pl.'s Ex. W [Doc. No. 78-23]. The two-page document shows a balance of 34 vacation days as of October 2021, and a 19-day downward adjustment on March 6, 2022, leaving a 15-day balance as of that date. Id. No party claims Serebrennikov was on vacation at that time and there is no evidence in the record that he was paid for that adjustment in March or April 2022.

On May 31, 2022, Serebrennikov received a $20,357.10 payment from Proxet for unused vacation time, and Serebrennikov acknowledges that he was compensated for an estimated 15 vacation days in May 2022. Pl.'s Resp. to Def.'s SOMF ¶ 24 [Doc. No. 77]. Serebrennikov contends that this was for part of the estimated 30 days he had accrued, and that he did not take the remainder of his available vacation. See Pl.'s Ex. A 133:1–134:6 [Doc. No. 78-1]. Serebrennikov also denied in his deposition that his travel to the Poconos in June was for vacation. Id. at 154:2–155:7. Consistent with these statements, Serebrenikov has provided a screenshot of a page from Proxet's human resources management platform, with a document header of Sunday, July 31, showing he still had 15 available vacation days on his last day with Proxet. Pl.'s Ex. W CM/ECF p. 3 [Doc. No. 78-23]; see also Pl.'s Ex. A 131:11–131:24 [Doc. No. 78-1] (testifying in his deposition that he obtained this record in July 2022). In light of record evidence suggesting that Plaintiff was entitled to 30 days of vacation per year, and where the record is disputed as to whether Serebrennikov was on vacation for three weeks in June, the compensation for vacation days at the end of May does not preclude a jury finding that he was owed compensation for 15 days when he left Proxet. Accordingly, Defendants are not entitled to summary judgment on Serebrennikov's claim for unused vacation time.

  c.  Unpaid Bonus

Serebrennikov alleges that he is owed a "definitively determined and due" bonus of $100,000. Am. Compl. ¶ 70 [Doc. No. 28]. Defendants assert that there is no evidence to suggest that Serebrennikov was guaranteed a $100,000 bonus in 2022. Mem. ISO Mot. for Summary Judgment 13 [Doc. No. 74].

Discretionary bonuses do not constitute "wages" under the Wage Act. See Weems v. Citigroup Inc., 453 Mass. 147, 153–54, 900 N.E.2d 89 (2009). Instead, bonuses must be non-

discretionary to be recoverable. See Boesel v. Swaptree, Inc., 2013 WL 7083258, at *4 & n.4 (Mass. Super. Dec. 23, 2013). Moreover, bonuses contingent on continued employment do not constitute earned wages under the Wage Act where the contingency never occurs, and the employer is not obligated to pay the bonus. See Weiss v. DHL Exp., Inc., 718 F.3d 39, 47–48 (1st Cir. 2013).

Serebrennikov's bonus is not recoverable under the Wage Act because he did not continue working through August 2022. Serebrennikov asserts he entered a verbal agreement to work through August "in exchange for his wages and annual bonus." Pl.'s Reply 5 [Doc. No. 83]. But it is undisputed that Serebrennikov stopped working for Proxet on July 31, 2022. Where Defendants' alleged agreement to pay Serebrennikov a $100,000 bonus in 2022 was conditioned on Serebrennikov working through the end of August, but that condition did not occur, the bonus does not constitute earned wages.

The evidence that Serebrennikov cites supports that the bonus was conditional on working for Proxet through August. Serebrennikov stated in his deposition that his "final agreement" with Medvedovsky was to pay Serebrennikov's bonus "by [his] anniversary with the company," which occurred at the end of August. Pl.'s Ex. A 182:1–182:16 [Doc. No. 78-1]. And Serebrennikov cites emails that show only that he proposed Proxet would pay him the bonus even though he was no longer departing on the terms to which the parties had agreed. See Pl.'s Ex. S [Doc. No. 78-19] ("Scenario I - You are dismissing me on July 31" and paying "$100,000 bonus for the 12 months from September 2021 to September 2022."); Pl.'s Ex. T CM/ECF p. 1 [Doc. No. 78-20]. Accordingly, even if Serebrennikov can establish at trial the existence of the verbal agreement to a non-discretionary bonus (which Defendants dispute), he is barred from

recovery of that bonus as part of his Wage Act claim where it was conditional on his continued work through the end of August.

Serebrennikov argues that when an employer agrees to pay "a set sum" separate from an employee's salary, "and the employer prematurely terminates the agreement, the sum remains subject to the Wage Act," citing Salter v. Lopez, 2013 WL 7121297 (Mass. Super. Oct. 28, 2013). Pl.'s Opp'n and Cross-Mot. 18 [Doc. No. 80]. The court in Salter explained that "[t]he [Wage] Act is violated when an employer fails to pay a definitively determined commission which has become due and payable to the employee." Salter, 2013 WL 7121297, at *6 (emphasis added) (citation omitted). However, where an agreement establishes contingencies that an employee must meet to earn specific compensation, "courts apply the terms of the agreement in determining whether [compensation] is due and payable for purposes of the [Wage] Act." Id. (internal quotations and citation omitted). Here, as explained above, Serebrennikov alleges an agreement that conditioned his 2022 bonus on remaining with Proxet through the end of August. Where Serebrennikov's last day with Proxet was in July, Serebrennikov has failed to establish a reasonable dispute that his $100,000 bonus became "due and payable" such that it is recoverable under the Wage Act.

### 2.    Breach of Contract

Defendants also seek summary judgment on the breach of contract claim. Serebrennikov has alleged a verbal agreement under which "the parties agreed that, in exchange for Serebrennikov postponing his resignation . . . until August 31, 2022 . . . , Proxet would pay Serebrennikov his normal salary of $22,500 per month for the months of March through and August 2022, plus his $100,000 bonus." Am. Compl. ¶ 62 [Doc. No. 28]. Defendants argue that Serebrennikov cannot establish that a valid oral contract existed. Mem. ISO Defs.' Mot. for

Summary Judgment 15–16 [Doc. No. 74]. Alternatively, Defendants assert that enforcement of such contract is barred by the Massachusetts Statute of Frauds because the evidence demonstrates that the alleged agreement could not be performed in one year. Id. 17.

To establish a claim for breach of a written contract, a plaintiff must prove that "a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach." Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007). "Oral contracts are as enforceable as written contracts so long as they are not barred by the Statute of Frauds." Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 598 n.40, 864 N.E.2d 518 (2007). The Massachusetts statute of frauds provides that "[n]o action shall be brought . . . [u]pon an agreement that is not to be performed within one year from the making thereof." M.G.L. c. 259, § 1. "For an oral contract to . . . be voided by" the statute of frauds, "the parties must either expressly stipulate, or it must appear to have been understood by them, that the contract was not to be performed within a year." In re Furst, 914 F. Supp. 734, 738 (D. Mass. 1996) (citing Novel Iron Works v. Wexler Construction Co., 26 Mass. App. Ct. 401, 410, 528 N.E.2d 142 (1988)).

Serebrennikov has put forth sufficient evidence to create a dispute of fact as to whether the alleged agreement existed. It is undisputed that Kanfer, Medvedovsky, and Serebrennikov agreed that Serebrennikov would remain with Proxet through August following a conversation in March 2022. See Defs.' SOMF ¶ 23 [Doc. No. 75] ("On March 24, 2022, Plaintiff informed Kanfer that he would depart in August 2022, and Kanfer and Medvedovsky accepted this end date."); Pl.'s Resp. to Defs.' SOMF ¶ 23 [Doc. No. 77] ("Plaintiff told Medvedovsky and Kanfer that he could work for Proxet until the end of August, and that was the maximum amount of time

26

he could provide. The parties agreed that Plaintiff would stay at Proxet until August, receive his bonus, and say goodbye.") (internal citation omitted).

Moreover, there is evidence in the record suggesting that the parties agreed that Serebrennikov would receive a $100,000 bonus in 2022: Serebrennikov stated in his deposition that he and Medvedovsky had previously agreed that Serebrennikov would receive that bonus on his anniversary with Proxet in 2022. Pl.'s Ex. A 181:6-183:1 [Doc. No. 78-1]. And Serebrennikov received a $100,000 payment from Proxet in August 2021. In March, Serebrennikov told Kanfer he could continue working through the end of August, and Kanfer and Medvedovsky accepted this end date. Moreover, subsequent communications between Medvedovsky, Kanfer and Serebrennikov reference the parties' previous agreement that Serebrennikov would remain with Proxet through August and would receive his monthly payment plus the $100,000 bonus in exchange. On July 28, 2022, Serebrennikov proposed three scenarios to Medvedovsky indicating that the parties had previously agreed that he would remain with Proxet through August and seeking payment of a $100,000 bonus. See Pl.'s Ex. S [Doc. No. 78-19]. And in an email to Serebrennikov on July 30, 2022, Kanfer stated that Serebrennikov gave notice that he would leave Proxet on March 24, 2022, and "we agreed you would remain working in your regular capacity until August 31." Pl.'s Ex. T CM/ECF p. 1 [Doc. No. 78-20]. Drawing all inferences in Serebrennikov's favor, a factfinder could determine from this evidence that the parties had agreed in 2021 on a $100,000 bonus for Serebrennikov to be paid in August 2022, and then subsequently agreed in March 2022 to continue this arrangement through August 2022 after Serebrennikov informed Proxet that he wished to leave the company.

An oral agreement to those terms would not be void under the statute of frauds. The agreement at issue—that Serebrennikov would remain with Proxet through August 2022 in

exchange for receiving his pay for August and his bonus—was purportedly reached in March

2022 after Serebrennikov informed Proxet in February that he intended to leave the company.

Under this agreement, each party's performance would have been due by the end of August

2022, less than one year from the agreement's formation. The statute of frauds does not require

this agreement to be in writing. See M.G.L. c. 259, § 1.

        3.     Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendants also seek summary judgment on Serebernnikov's claim for breach of the

implied covenant of good faith and fair dealing, arguing that he fails to identify the contract on

which this claim is based, and because there is no evidence indicating that Proxet acted in bad

faith. Mem. ISO Defs.' Mot. for Summary Judgment 17–18 [Doc. No. 74]. Serebrennikov

contends that he "was entitled by contract to work through August 31, 2022," Pl.'s Opp'n and

Cross-Mot. 20 [Doc. No. 80], and that Proxet instead terminated him on July 28, which deprived

him of wages and a bonus that he was due to receive in exchange for remaining with the

company, see Pl.'s Reply 8–9 [Doc. No. 83].

"The covenant of good faith and fair dealing is implied in every contract." Uno

Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957 (2004).

The covenant provides that "neither party shall do anything that will have the effect of

destroying or injuring the rights of the other party to receive the fruits of the contract[.]"

Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471, 583 N.E.2d 806 (1991) (citations

omitted). This rule prevents "overreaching by employers and the forfeiture by employees of

benefits almost earned by the rendering of substantial services." See Fortune v. Nat'l Cash Reg.

Co., 373 Mass. 96, 105, 364 N.E.2d 1251 (1977) (collecting cases). Violation of the covenant of

good faith and fair dealing requires "bad faith conduct implicating a dishonest purpose,

28

consciousness of wrong, or ill will in the nature of the fraud." <u>Targus Grp. Int'l, Inc. v. Sherman</u>, 76 Mass. App. Ct. 421, 435, 922 N.E.2d 841 (2010) (internal quotations and citation omitted).

Although Defendants contend that Serebrennikov chose to end his work for Proxet prematurely, <u>see</u> Defs.' Mem. ISO Mot. for Summary Judgment 18 [Doc. No. 74], Serebrennikov has established a dispute as to whether he was terminated where Kanfer sent Serebrennikov a proposed termination agreement in July "[t]o formalize the going forward period" in light of purported issues with Serebrennikov's production. <u>See</u> Pl.'s Ex. T CM/ECF 1 [Doc. No 78-20].

Assuming Proxet terminated Serebrennikov, a reasonable factfinder could conclude that his termination breached the covenant implied in the alleged agreement for Serebrennikov to work through August in exchange for his bonus and pay for that month. "The covenant of good faith and fair dealing prevents an employer from unjustly enriching himself by depriving the employee of money which [he] fairly earned and legitimately expected." <u>Salter</u>, 2013 WL 7121297, at *7 (citing <u>Maddaloni v. W. Mass. Bus Lines, Inc.</u>, 386 Mass. 877, 881, 438 N.E.2d 351 (1982)). "An employer may not discharge an employee in order to . . . reap for itself financial benefits due its employee," and a discharge for that purpose "is a discharge in bad faith." <u>Maddaloni</u>, 386 Mass. at 884; <u>accord</u> <u>Salter</u>, 2013 WL 7121297, at *7.

Accordingly, Defendants are not entitled to summary judgment on Serebrennikov's claim for breach of the covenant of good faith and fair dealing.

C.    *Plaintiff's Cross-Motion for Summary Judgment*

Where Defendants are not entitled to summary judgment on Serebrennikov's claim under the Wage Act based on unreimbursed travel expenses following his termination and unpaid vacation time, the court considers Serebrennikov's cross-motion for partial summary judgment

that Defendants misclassified him as an independent contractor under his Agreements with Proxet. Opp'n 6 [Doc. No. 80]. Defendants respond that misclassification under M.G.L. c. 149, § 148B is not at issue in this case because Serebrennikov has not asserted a cause of action under that section of the Wage Act. Defs.' Reply 2 [Doc. No. 81].

Defendants are correct that Serebrennikov has not asserted a cause of action under M.G.L. c. 149, § 148B for misclassification. But Serebrennikov is required to establish as an element of his wage claim that he was Proxet's employee because the Wage Act only protects employees. See Sebago v. Bos. Cab Dispatch, Inc., 471 Mass. 321, 327, 28 N.E.3d 1139 (2015) ("Individuals who provide services to an employer as an employee (rather than as an independent contractor) fall within the protection of the wage act . . . .") (citation omitted).  Accordingly, the classification issue is before the court.

Serebrennikov's Consulting Agreement with Proxet labeled him an independent contractor, but that language does not determine whether Serebrennikov was Proxet's employee for purposes of the Wage Act. See Taylor,465 Mass. at 196 (explaining "whether the plaintiffs were independent contractors or employees" is not an issue contracting parties "could resolve with an explicit provision in the contract"). Nor does the fact that he was paid as an independent contractor resolve the issue. See M.G.L. c. 149, § 148B(b) ("The failure to withhold federal or state income taxes or to pay unemployment compensation contributions or workers compensation premiums with respect to an individual's wages shall not be considered in making a determination [as to whether an individual is an employee]"). Instead, under Massachusetts law, "an individual performing any service is presumed to be an employee." Sebago, 471 Mass. at 327. The purported employer can rebut the presumption of employment by establishing the three indicia of an independent contractor relationship set forth by statute. Id. Those indicia are:

(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

(2) the service is performed outside the usual course of the business of the employer; and

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

M.G.L. c. 149 § 148B(a). "The failure to satisfy any prong will result in the individual's classification as an employee." Sebago, 471 Mass. at 327.

Here, Defendants contend that issues of fact remain regarding whether Serebrennikov was "free from [Proxet's] control and direction in connection with the performance of his service" where Serebrennikov stated in his deposition that he "had free reign" as Proxet's COO. Defs.' Reply 2 n.1 [Doc. No. 81] (quoting Somers v. Converged Access, Inc., 454 Mass. 582, 589, 911 N.E.2d 739 (2009)). However, Defendants do not contend that Serebrennikov's work was "performed outside the usual course of [Proxet's] business." To the contrary, the record shows that Serebrennikov was directly involved in performing Proxet's usual business.

The record also shows that Serebrennikov was not "engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed" for Proxet. M.G.L. c. 149 § 148B. Serebrennikov's Consulting Agreement with Proxet explicitly barred him from providing "consulting or other services for," or engaging in employment with, Proxet competitors, Pl.'s Ex. I CM/ECF p. 2 [Doc. No. 78-9], and there is no evidence in the record that Serebrennikov was otherwise engaged in any independent business. Where Defendants have failed to establish all three indicia that Serebrennikov worked for Proxet as an independent contractor, the court finds Serebrennikov was Proxet's employee.

**IV.    Conclusion**

For the foregoing reasons, Defendants' <u>Motion to Strike</u> [Doc. No. 81] is granted as to the draft Termination Agreement and the untranslated text messages and is otherwise DENIED. The court GRANTS Serebrennikov's <u>Cross-Motion for [Partial] Summary Judgment</u> [Doc. No. 80], finding that the Massachusetts Wage Act applies to his relationship with Defendants and that Serebrennikov was Proxet's employee. Defendants' <u>Motion for Summary Judgment</u> [Doc. No. 73] is GRANTED as to Serebrennikov's Wage Act claims for wages withheld through unreimbursed business expenses incurred prior to the end of his work for Proxet, and for a $100,000 bonus, and is otherwise DENIED.

IT IS SO ORDERED.

October 20, 2025                                    /s/Indira Talwani_____
                                                                United States District Judge